**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CORNERSTONE SYSTEMS, INC.,** a Tennessee corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **KNICHEL LOGISTICS, L.P.**, a Pennsylvania limited partnership; **KNICHEL MANAGEMENT CORPORATION**, a Pennsylvania corporation; **WILLIAM R. KNICHEL**, an individual; **ISRAEL BARKLEY**, an individual; **KANDACE BARKLEY**, an individual; **JUSTIN BARKLEY**, an individual; **TANYA EKAMA**, an individual; **JESSICA GRANT**, an individual; **RACHEL GRANT**, an individual; **KRISTY KNICHEL**, an individual; **WILLIAM KNICHEL, JR.**, an individual; **SCOTT KNECHTEL**, an individual; **CHAD MEYERS**, an individual; and **JENNIFER SAPIENZA**, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| v. | ) ) |
| **CORNERSTONE SYSTEMS, INC.**; **RICK RODELL**; **TIM CLAY**; and **PAT NIEMAN**, | ) ) ) ) ) |
| Counterclaim Defendants. | ) |

2:03cv584
**Electronic Filing**

**MEMORANDUM OPINION**

August 24, 2006

**I.    INTRODUCTION.**

Plaintiff, Cornerstone Systems, Inc. ("Cornerstone"), filed a complaint in replevin on Friday, April 25, 2003, seeking to recover possession of certain property comprised of "sensitive, proprietary and confidential information in the possession of the defendants," and simultaneously filed a Motion for a Temporary Restraining Order pursuant to FED. R. CIV. P. 65(b).[1]    After a hearing, the Court found that Cornerstone failed to meet its burden and the

---

[1]    Though Cornerstone requested *ex parte* relief under Rule 65(b), it provided neither an affidavit nor verified complaint showing that immediate and irreparable harm would result before

Motion for a Temporary Restraining Order was denied.

Cornerstone then filed an amended complaint against Defendants, Knichel Logistics, L.P., Knichel Management Corporation, William Knichel and several employees of Knichel Logistics[2] ("Knichel Defendants" of "Knichel"), alleging: (1) misappropriation of trade secrets at Counts I and II; (2) false designation of origin/false description in violation of 15 U.S.C. § 1125(a) at Counts III and IV; (3) breach of duty of loyalty at Counts V and VI; (4) tortious interference with contractual and/or business relationships at Count VII; and (5) replevin at Count VIII.  The Knichel Defendants answered and filed a counterclaim alleging: (a) unfair competition at Count I; (b) tortious interference at Count II; and (c) breach of contract/restitution at Count III.  An amended counterclaim was later filed by the Knichel Defendants adding claims of defamation at Count IV and business disparagement at Count V. The parties have filed motions for summary judgment and the matters are now before the Court.

II.    STATEMENT OF THE CASE

Plaintiff, Cornerstone Systems, Inc. ("Cornerstone"), is a Tennessee corporation that operates as a non-asset-based transportation company with regional offices throughout the United States. (Amended Complaint ¶¶ 1 and 22). Certain companies, like Cornerstone, are known in the United States transportation industry as intermodal marketing companies ("IMCs") and brokers ("Brokers")(collectively referred to as "IMC/Brokers")[3] and serve their customers by making the logistical arrangements for the transportation of large shipments of freight from one location to another throughout the United States. (Amended Complaint ¶ 23;

the defendants could be heard on the matter.

[2]    The defendant employees were voluntarily dismissed from this action on November 15, 2005.

[3]    In the railroad industry, such companies are called IMCs, and in the trucking industry such companies are called Brokers. (Amended Complaint ¶ 24).

Knichel's Concise Statement of Material Facts ("CSMF") ¶ 11). To facilitate this service, an IMC/Broker typically negotiates and enters into contracts with freight carriers such as railroad and trucking companies ("Carriers") to transport freight for the benefit of the customers and/or the accounts of the IMC/Broker. (Knichel's CSMF ¶ 12).

Contracts between Carriers and IMC/Brokers typically quote or reference a series of standard rates the Carrier charges for shipment. (Amended Complaint ¶ 25; Knichel's CSMF ¶¶ 13 & 14). Once a Carrier and IMC/Broker enter into a General Contract, the parties often negotiate special commodity rates ("Special Price Quotes or SPQ's") to apply between the parties with respect to certain shipments. (Amended Complaint ¶ 26; Knichel's CSMF ¶ 15). The SPQ's fall below the standard rates quoted or referenced in the contract, and can be negotiated only if the IMC/Broker and the Carrier have entered into a general contract. *Id.* The SPQ's are supposed to be kept confidential between the Carrier and the IMC/Broker in order to protect any competitive advantage the IMC/Broker enjoys under a particular SPQ. (Cornerstone's Response to Concise Statement of Material Facts ("RCSMF") ¶ 15). It also protects a Carrier from being approached by another IMC/Broker and demanding from the Carrier an equivalent SPQ. *Id.* A customer/shipper may transfer an SPQ from one IMC/Broker to another by using what is referred to as a "replacement letter." (Knichel's CSMF ¶ 17). In addition, if a customer/shipper wants to add another IMC/Broker to an SPQ, the customer/shipper may do so by using what is referred to as a "me too letter." *Id.*

In July of 1997, William Knichel ("Knichel") became an employee of Cornerstone, representing Cornerstone in Western Pennsylvania. (Amended Complaint ¶ 38 & Ex. A). On or about April 26, 2000, Knichel became an independent agent of Cornerstone responsible for the routing of freight, selection of carriers, negotiation of rates, rail billings, invoicing, collections and customer service on behalf of Cornerstone. (Knichel's CSMF ¶¶ 32 & 33). During the term of his association with Cornerstone, Knichel traded under the name "Cornerstone Systems - Pittsburgh (or PGH)." (Knichel's CSMF ¶ 40). Though the agency letter agreements did not prohibit Knichel from billing shipments through an ICM/Broker other

than Cornerstone, there is no evidence that Knichel was anything but an exclusive agent of
Cornerstone during their relationship.

By letter dated March 28, 2003, Knichel notified Cornerstone that he was terminating
his relationship with Cornerstone effective April 27, 2003. (Knichel's CSMF ¶ 49; Amended
Complaint Ex. C).  Following the submission of his termination letter, Knichel continued to
book transportation business through Cornerstone and to perform the duties and obligations set
forth in his agency agreements with Cornerstone up through and including the last business day
of the relationship. (Knichel's CSMF ¶ 51).

On April 11, 2003, more than two (2) weeks prior to the effective date of his
resignation as independent agent for Cornerstone, Knichel sent letters to several customers
announcing that the "entire Cornerstone Systems Pittsburgh office [had] resigned from
Cornerstone Systems effective April 27, 2003." (Amended Complaint Ex. E). The letter was on
"Cornerstone Systems - PGH" letterhead and stated that Knichell Logistics had "secured our
own rail contracts, insurance coverage, and over the road brokerage authority." *Id.*  Further,
Knichel included a solicitation of the customers' business for Knichel Logistics by enclosing a
replacement letter that would  ". . . replace Cornerstone Systems with Knichel Logistics for any
special quotes . . . and prevent Cornerstone Systems from participating in any future business
under [the] quotes." *Id.*

On April 21, 2003, during the period of his agency agreement with Cornerstone,
Knichel sent a letter to several draymen on Knichel Logistics letterhead indicating that the
"Pittsburgh office of Cornerstone Systems would no longer be representing Cornerstone
Systems as of the close of business on Friday, April 25, 2003."  (Amended Complaint Ex. F).

Cornerstone then instituted this action.


III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no
genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of

law.  To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.*  The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well.  *Whiteland Woods, L.P. v.  Township of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c),  its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e).  Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

In the trademark context, if the record contains no evidence of actual confusion between the parties' marks, the Court can conclude that "no likelihood of confusion exists as a matter of law." *See generally V Secret Catalogue, Inc. v. Moseley*, 2000 U.S. Dist. LEXIS 5215 (W. D. Ky. 2000).

IV.    DISCUSSION

    A.    **The Knichel Defendants' Motion for Summary Judgment**

        Cornerstone's Claim for Misappropriation of Trade Secrets

        Cornerstone contends that the Knichel Defendants are liable for misappropriation of trade secrets for their alleged post-termination retention and use of the SPQs negotiated with the carriers that shipped through Cornerstone.  In a Memorandum Order dated April 29, 2003, this Court found that Cornerstone had failed to meet its burden that such information constituted trade secrets under Pennsylvania law.  After reviewing this record on summary judgment, the Court finds no basis in fact or law deviate from its earlier ruling.

        Trade secret misappropriation cases are governed by state tort law. *Midland-Ross Corp. v. Sunbeam Equip. Corp.*, 316 F. Supp. 171, 177 (W.D. Pa.1970), *aff'd per curiam*, 435 F.2d 159 (3d Cir. 1970). Pennsylvania courts have adopted the definition of trade secret found in a comment to the Restatement of Torts. *See Smith v. BIC Corp.*, 869 F.2d 194, 199 (3d Cir. 1989); *see also* RESTATEMENT OF TORTS § 757 cmt. b (1939). This comment provides:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. [A trade secret] . . . differs from other secret information in a business . . . in that it is not simply information as to single or ephemeral events in the conduct of a business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business.

*Id.  See also Emtec, Inc. v. Condor Tech. Solutions, Inc.,* 1998 U.S. Dist. LEXIS 18846 *17-18 (E. D. Pa. 1998).  In addition, the Third Circuit cited several factors which should be considered in concluding whether certain information is a trade secret:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the

> extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985) (*citing* RESTATEMENT OF TORTS § 757 cmt. b (1939)).

Further, a trade secret can be a plan or process, tool or mechanism, compound or element which is known only to its owner and those employees to whom it is necessary to inform of it. *See Van Prods. Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 775 (1965). "Novelty is only required of a trade secret to the extent necessary to show that the alleged secret is not a matter of public knowledge." *Id.* Consequently, information that is in the public domain cannot be protected as trade secrets. *See id.*

Protection has been extended to certain business and marketing information. *See, e.g., S.I. Handling*, 753 F.2d at 1260 (extending trade secret protection to cost and pricing information); *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191 (5th Cir. 1984) (extending trade secret protection to marketing information and strategies); *Alexander & Alexander, Inc. v. Drayton*, 378 F. Supp. 824, 833 (E.D. Pa.) (extending trade secret protection to the terms of specific customer accounts), *aff'd*, 505 F.2d 729 (3d Cir. 1974); *Air Prods. & Chems., Inc. v. Johnson*, 296 Pa. Super. 405, 442 A.2d 1114, 1121 (1982) (extending trade secret protection to business plans and financial projections).

Customer lists and confidential business information cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder. *General Business Services, Inc. v. Rouse*, 495 F. Supp. 526, 530 (E.D. Pa. 1980) (*citing Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 777 (1965) and *Denawetz v. Milch*, 407 Pa. 115, 178 A.2d 701, 704-705 (1962)); *see SI Handling v. Heisley*, 753 F.2d 1244, 1258-59 (3d Cir. 1985). Accordingly, courts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a

-7-

potential customer for a given product. *S.I. Handling*, 753 F.2d at 1258; *Van Products Co. v. General Welding and Fabrication Company*, 419 Pa. 248, 263, 213 A.2d 769, 777 (1965); *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 358, 162 A.2d 370 (1960).   The burden is on the plaintiff to show that the names of customers constituted a trade secret. *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 162 A. 2d 370 (1960). *Burroughs Corp. v. Cimakasky*, 346 F. Supp. 1398, 1400 (E. D. Pa. 1972).

Moreover, the gravaman of liability for disclosure of a trade secret is whether the secret was communicated to the employee while he was employed in a position of trust and confidence. Clearly, if the information was originally in the employee's possession then it could not have been communicated to him by the employer so as to make it inequitable or unjust for the employee to disclose it to others. *See Fidelity Fund, Inc. v. Di Santo*, 347 Pa. Super. 112, 122, 500 A.2d 431, 437 (1985).

In this instance, Cornerstone failed in its burden to show: (1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer has the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the Knichel Defendants while employed in a positions of trust and confidence under such circumstances as to make it inequitable and/or unjust for Deendants to disclose it to others, or to make use of it in their own right, to the prejudice of Cornerstone. *S. I. Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985). Therefore, summary judgment on Cornerstone's claim of misappropriation of trade secrets shall be granted.

<u>Cornerstone's Claim for False Designation Under the Lanham Act</u>

At Counts III and IV of its amended complaint, Cornerstone alleges  false designation of origin and false description in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), with respect to the letters dated April 11, 2003, and April 23, 2003, and sent by Bill Knichel to certain customers.  Section 43(a) provides:

> (a)(1) Any person who, on or in connection with any goods or
> services . . . uses in commerce any word, term, name, symbol, or

device, or any combination thereof, or any false designation of
origin, false or misleading description of fact, or false or
misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to
deceive as to the affiliation, connection, or association of such
person with another person, or as to the origin, sponsorship, or
approval of his or her goods, services, or commercial activities
by another person . . .

\* \* \*

shall be liable in a civil action by any person who believes that he
or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To prevail on a claim for false designation of origin under the Lanham Act, Cornerstone
must demonstrate that (1) it owns the mark in question; (2) the mark is valid and legally
protectable; and (3) Knichels's use of the mark to identify goods or services is likely to create
confusion concerning their origin. *See Checkpoint Sys., Inc. v. Check Point Software Techs.,
Inc.*, 269 F.3d 270, 279 (3d Cir. 2001), *A & H Sportswear v. Victoria's Secret Stores,* 237 F.3d
198, 210 (3d Cir. 2000), *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214
F.3d 432, 437 (3d Cir. 2000).   To prove likelihood of confusion, Cornerstone  must show that
"consumers viewing the mark would probably assume the product or service it represents is
associated with the source of a different product or service identified by a similar mark." *Scott
Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978).

The Lanham Act states that the registration of an incontestable mark is conclusive
evidence of "the validity of the registered mark and of the registration of the mark, of the
registrant's ownership of the mark, and of the registrants exclusive right to use the registered
mark in commerce." 15 U.S.C. § 1115(b).  *See also Park N' Fly, Inc. v. Dollar Park and Fly,
Inc.*, 469 U.S. 189, 196 (1985)("With respect to incontestable marks . . ., § 33(b) provides that
registration is conclusive evidence of the registrant's exclusive right to use the mark. . . .").
Under the Lanham Act, a registered mark becomes "incontestable" upon the filing of an
affidavit of use between the fifth and sixth years of that mark's registration.  15 U. S. C. §§
1058, 1065; *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187,

190 (3d Cir. 1990).

Cornerstone has not federally registered the name "Cornerstone Sytems," and makes no argument that it is incontestable under 15 U. S. C. §§ 1058 and 1065. Therefore, in order to prevail, Cornerstone must prove the strength of its mark or show "secondary meaning" of the mark. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 282-283.

The strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 478-479 (3d Cir. 1994). Under distinctiveness, a court looks at the inherent features of the mark. Trademarks protected under the Lanham Act are divided into four categories:

> [1] arbitrary or fanciful marks [that] use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." [2] Suggestive marks [that] require consumer "imagination, thought or perception" to determine what the product is. [3] Descriptive terms [that] "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods" [and] [4] generic marks . . . that "function as the common descriptive name of a product class."

*A&H Sportswear*, 237 F.3d at 221-22 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296-97 (3d Cir. 1986)). While generic marks do not receive trademark protection, arbitrary, suggestive and descriptive marks with a demonstrated secondary meaning are entitled to trademark protection. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 282-283. The Court is mindful that the distinctions between the categories are less than clearly defined and may be difficult to distinguish. As previously stated by courts in other circuits, "[t]hese categories, like the tones in a spectrum, tend to blur at the edges and merge together. The labels are more advisory than definitional, more like guidelines than pigeon holes. Not surprisingly, they are somewhat difficult to articulate and apply." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C. Cir. 1989) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983)) Whether Cornerstone's mark is classified as arbitrary, suggestive or descriptive, however, is irrelevant as this Court finds no

-10-

evidence of secondary meaning in the record.

Proof of secondary meaning entails vigorous evidentiary requirements, and the burden of proof rests upon the party asserting rights in the purported mark. *Ideal World Marketing, Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 245 (E.D. N.Y. 1998). Cornerstone must establish secondary meaning at the time and place that the Knichel Defendants began use of the mark. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d at 1231. In order for secondary meaning to exist, "it is not necessary for the public to be aware of the name of the [source]. . . . It is sufficient if the public is aware that the product [or service] comes from a single, though anonymous, source." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 380 (7th Cir. 1976). The factors relevant to determining whether a mark has acquired secondary meaning include: the extent of sales and advertising leading to buyer association; length of use; exclusivity of use; the fact of copying; customer surveys; customer testimony; the use of the mark in trade journals; and actual confusion. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir.), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.*, 116 L. Ed. 2d 324, 112 S. Ct. 373 (1991) (citations omitted).

Cornerstone began using the name "Cornerstone Systems, Inc." in 1997. Cornerstone's Responsive Statement of Facts ¶¶ 19 and 40. In July of 1997, William Knichel ("Knichel") became an employee of Cornerstone, representing Cornerstone in Western Pennsylvania. (Amended Complaint ¶ 38 & Ex. A). On or about April 26, 2000, Knichel became an independent agent of Cornerstone. (Knichel's CSMF ¶¶ 32 & 33). During the term of his association with Cornerstone, Knichel traded under the name "Cornerstone Systems - Pittsburgh (or PGH)." (Knichel's CSMF ¶ 40). This was done with Cornerstone's knowledge and permission. Without a modicum of evidentiary support in the record, Cornerstone contends that use of the name by Knichel "led many to believe that Cornerstone Systems-PGH was an office of Cornerstone," therefore, there is a "reasonable likelihood that [Cornerstone] will be able to show that its designation has achieved secondary meaning and is therefore legally protectable." Cornerstone's Memorandum in Opposition, pp. 18-19.

Cornerstone has failed to show this Court that any of the above mentioned factors relevant to secondary meaning, *i.e.* the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, and actual confusion, either exist or weigh in its favor.  Accordingly, summary judgment will be granted on Counts III and IV.

<u>Cornerstone's Claim for Breach of Duty of Loyalty</u>

Cornerstone alleges that the Knichel Defendants are liable for breach of the common law duty of loyalty for the alleged solicitation on behalf of Knichel Logistics of customers and carriers with which Cornerstone had existing business relationships prior the Knichel Defendants' termination of their relationship with Cornerstone.  Knichel contends, however, that Cornerstone is unable to show any instance where freight orders received by Knichel or the Knichel Defendants prior to April 25, 2003, were diverted to and handled by Knichel Logistics.

Under Pennsylvania law, an agent, or employee, owes a duty of loyalty to his employer, and must act with utmost good faith and loyalty in furtherance of the employer's interests. *Kademenos v. Equitable Life Assurance Soc. of U.S.*, 513 F.2d 1073, 1076 (3rd Cir. 1975); *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962);  *Garbish v. Malvern Fed. Sav. & Loan Ass'n*, 517 A.2d 547, 553-554 (Pa. Super 1986).  However, this obligation is not absolute, as stated by the Pennsylvania Supreme Court in *Spring Steels, Inc. v. Molloy*, 162 A.2d 370 (Pa. 1960):

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed . . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete . . . .

*Spring Steels, Inc. v. Molloy*, 162 A.2d  at 372 (citing RESTATEMENT (SECOND) OF AGENCY § 393 cmt. e). *See also Renee Beauty Salons, Inc. v. Blose-Venable*, 652 A.2d 1345, 1347 (Pa. Super. 1995) (quoting RESTATEMENT (SECOND) OF AGENCY § 393 cmt. e).

Clearly, then, unless enjoined by a restrictive covenant or by the misuse of confidential information peculiar to Cornerstone's business, Knichel and the Knichel Defendants were permitted to engage in a business rival to that of Cornerstone, and to solicit and/or acquire some of Cornerstone's customers after termination of the agency agreement. *See Fidelity Fund, Inc. v. Di Santo*, 500 A.2d 431, 437 (Pa. Super. Ct. 1985).  Pennsylvania law also permitted Knichel to "make arrangements to compete" prior to his termination on April 25, 2003.

Knichel was not subject to a covenant not to compete in this instance, and this Court has already determined that there was no improper use of trade secrets or confidential information.  The evidence supports Knichel's contention that he had previous business relationships with the customers he contacted, although this Court finds such customers were Cornerstone's as Knichel was either acting as an employee or agent of Cornerstone during the period relevant to this action.  Moreover, there is no evidence that Knichel usurped any business opportunity from Cornerstone prior to his termination.  As a matter of law, Cornerstone's claims of breach of loyalty fail in this instance.  Summary Judgment in favor of the Knichel Defendants shall be granted on such claims.

### Cornerstone's Claim of Tortious Interference with Contract

At Count VII of the amended complaint, Cornerstone alleges tortious interference with contractual and/or business relationships by the Knichel Defendants. Pennsylvania law defines tortious interference with contractual relations as "inducing or otherwise causing a third person not to perform a contract with another ... without a privilege to do so."  *Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 856 (3d Cir. 2000) (quoting *Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964)).  In order to prevail on a claim for intentional interference with contractual or prospective contractual relations, a plaintiff must prove: "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the

-13-

defendants' conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." *Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998)(citations omitted).

Pennsylvania courts have traditionally applied the Restatement (Second) of Torts in reviewing claims of intentional interference with contractual relations. *See Glenn v. Point Park College*, 272 A.2d 895 (Pa. 1971); *Allied Sec., Inc. v. Security Unlimited, Inc.*, 401 A.2d 1219 (Pa. Super. 1979); *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175 (Pa. 1978), *cert. denied*, 442 U.S. 907 (1979). *See also Green v. Interstate United Management Serv. Corp.*, 748 F.2d 827 (3d Cir.1984). Specifically, in determining whether an actor's conduct is "proper," Pennsylvania courts are guided by the following factors derived from the Restatement (Second) of Torts § 767 (1979):

(a)     The nature of the actor's conduct,

(b)     The actor's motive,

(c)     The interests of the other with which the
        actor's conduct interferes,

(d)     The interests sought to be advanced by the
        actor,

(e)     The proximity or remoteness of the actor's
        conduct to the interference, and

(f)     The relations between the parties.

*See Adler, Barish, Daniels, Levin and Creskoff  v. Epstein*, 482 Pa. at 432 (quoting RESTATEMENT (SECOND) OF TORTS § 767).  Whether an alleged interference is improper entails a "case-by-case inquiry." *Windsor Secur., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993) (citing *Green v. Interstate United Management Serv. Corp.*, 748 F.2d 827, 831 (3d Cir. 1984)). Where the evidence fails to raise a genuine issue of material fact as to the appropriateness of a defendant's conduct, summary judgment is warranted.  *See Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997).

The Court found above that Knichel's conduct prior to the termination of his agency relationship with Cornerstone was not improper under Pennsylvania Law.  There was no

-14-

restrictive covenant, and Knichel was free to compete with Cornerstone for its business after April 25, 2003.  Finding no inappropriate conduct, Cornerstone's claim for tortious interference with contract also fails as a matter of law.

Cornerstone's Replevin Claim

Cornerstone has abandoned its claim for replevin pleaded at Count VII of its amended complaint, and summary judgment in favor of the Knichel Defendants is therefore appropriate.

**B.      Cornerstone's Motion for Summary Judgment**

Knichel's Claim of Tortious Interference with Contract

At Count II of the counterclaim, the Knichel Defendants allege tortious interference with existing and prospective contracts. Applying the law set forth above, the Court finds that Knichel's claim for tortious interference is without merit.

The Court must first examine whether any contractual or prospective contractual relations existed between Knichel and third parties that would allow a claim for tortious interference.  From July of 1997 through April 25, 2003, Knichel was either an employee, or exclusive agent, of Cornerstone.  In those capacities, Knichel routed freight, selected carriers, negotiated rates and rail billings, invoiced customers, and performed collection and customer service functions for or on behalf of Cornerstone.  Moreover, it is undisputed that during this time period Knichel processed and billed all business through Cornerstone.  Subsequent to April 26, 2000, Knichel was certainly permitted to bill shipments through an ICM/Broker other than Cornerstone, however, there is no evidence that he ever did so.

Knichel admits that during the time of his agency relationship with Cornerstone, he sent the April 11, 2003 letter to Cornerstone customers.  Knichel contends, however, that he contacted only customers that he had either contacted and/or had done business with prior to his association with Cornerstone, or customers he had contacted and developed through his own efforts while associated with Cornerstone.  Such contention is of no moment in this instance.  Knichel was not operating his own business; during the relevant six (6) year period

-15-

all of his efforts were directed for and on behalf of his employer, and/or his principal. Though he had developed relationships with these customers, such relationships were not contractual in nature. Tellingly, Knichel's letter of April 11, 2003, soliciting business for Knichel Logistics, enclosed a replacement letter that specifically requested that the customers ". . . replace Cornerstone Systems with Knichel Logistics for any special quotes . . . and prevent Cornerstone Systems from participating in any future business under [the] quotes. [Customers] wish to use Knichel Logistics on all future shipments." (Amended Complaint Ex. E). Clearly, this was a request that customers shift their business relations from Cornerstone to Knichel Logistics. Knichel is unable to show a contractual relationship with these customers because they were customers of Cornerstone. It is illogical to find that Cornerstone interfered with its own contractual relationships.

Further, Knichel cannot show a valid prospective relationship with such customers because on or after April 27, 2003, Knichel and Cornerstone became competitors for the customers' business. Knichel, therefore, fails to satisfy the first element of a claim for tortious interference with contract. Notwithstanding such failure, the Court also analyzed the third and fifth requirements for a valid tortious interference claim.

To satisfy the third element of its claim, Knichel has the burden to present sufficient evidence of an absence of privilege, in this case a competitor's privilege, or justification on the part of Cornerstone. Section 768 of the Second Restatement of Torts states, in relevant part:

> (1)    One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
>     (a)    the relation concerns a matter involved in the competition between the actor and the other and
>
>     (b)    the actor does not employ wrongful means and
>
>     (c)    his action does not create or continue an unlawful restraint of trade and
>
>     (d)    his purpose is at least in part to advance his interest in competing with the other.

-16-

RESTATEMENT (SECOND) OF TORTS § 768 (1979). As an initial matter, there is no evidence that Cornerstone caused any third party to discontinue an existing contract with Knichel.  Further, a competitor does not "wrongfully interfere" with its competitor's at-will, or prospective, customers by simply competing for their business. *See* RESTATEMENT (SECOND) TORTS § 768; *CGB Occupational Therapy v. RHA Health Servs.*, 357 F.3d 375, 388-389 (3d Cir. 2004). Notwithstanding Knichel's failure to point to any discontinued contract or lost perspective contract, the only question regarding Cornerstone's privilege is whether Cornerstone employed "wrongful means" in its competition.

In defining "wrongful means," the comment to Section 768 provides: "the predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section." RESTATEMENT (SECOND) TORTS § 768 at cmt. e.  Moreover, "[c]ourts, relying partly on [Comment e of section 768], have interpreted the wrongful means element of § 768 to require independently actionable conduct on the part of the defendant." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 531 (3d Cir. 1998) (citing *DP-Tek, Inc. v. AT&T Global Information Solutions Co.*, 100 F.3d 828, 833-35 (10th Cir. 1996)). The Court of Appeals for the Third Circuit specifically noted that Pennsylvania courts have not adopted a definition for "wrongful means," but the court predicted that the Pennsylvania courts would adopt a meaning that included conduct that was "independently actionable." *See CGB Occupational Therapy v. RHA Health Servs.*, 357 F.3d 375, 388-389 (3d Cir. 2004)(citing *National Data Payment Sys. v. Meridian Bank*, 212 F.3d 849, 857-858 (3d Cir. 2000)). The Pennsylvania courts have yet to disagree.

A competitor, then, is only liable if the plaintiff shows that the competitor used tactics which were sufficiently "predatory" that such tactics form an independent basis for liability on the part of the defendant. *See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 at 388.  Such "independently actionable conduct" includes a defendant's breach of fiduciary duty, "physical violence, fraud, civil suits [or] criminal prosecutions." *Id.* at 389 (quoting

-17-

RESTATEMENT (SECOND) TORTS § 768 , cmt. e).  If the conduct is "sufficiently wrongful to be actionable by someone," it provides the basis for a tortious interference claim even if the party claiming tortious interference lacks standing to assert the claim. *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d at 389.

The Court has reviewed the alleged acts by Cornerstone which  Knichel contends were wrongful and tortiously interfered with Knichel's contractual relations.  *See* Knichel's Responsive Concise Statement of Material Facts ¶¶ 19-38.  Any of the alleged acts prior to April 27, 2003, regarding Cornerstone's contact with customers, plans to move business from Knichel, or plans to fire Knichel do not rise to the level of wrongful conduct.  Cornerstone had the right to end the contractual relationship with Knichel, contact its own customers[4] and it certainly had the right to move the operations of certain of its sales people away from Knichel.  Any accounting irregularities in the determination of Knichel's commissions is irrelevant to this analysis. Further, the Court is unable to find a breach of fiduciary duty, threats of physical violence or fraud on the part of Cornerstone.  It is undisputed that Cornerstone filed a civil suit, but the Court is unable to find such action "wrongful" such that it would result in an independent basis for liability.  Knichel, therefore, also fails to satisfy the third element of his tortious interference claim.

Finally, with regard to prospective contracts, Knichel must show a reasonable likelihood that the business or contractual relationship would have occurred but for the interference of the defendant.  Knichel fails to identify any customer that failed to enter into a contract with him "but for" Cornerstone's alleged interference. Clearly, Knichel has failed to satisfy the elements necessary for a tortious interference claim and summary judgment will be entered on behalf of Cornerstone on Count II of Knichel's counterclaim.

---

[4]    Though Knichel contends that the customers contacted were his customers, Knichel was an employee or agent for Cornerstoneduring the period from July 1997 through April 27, 2003, and therefore, had no "customers" of his own.

Knichel's Claim of Unfair Competition

At Count I of the counterclaim, the Knichel Defendants allege a common law unfair competition claim against Cornerstone premised upon, *inter alia*:

(a)   On the last day of the business relationship Cornerstone instituted legal action against Knichel Defendants and many of its employees;

(b)   Making plans in December of 2002 to "deep six" Bill Knichel and his operations;

(c)   Defaming and disparaging the Knichel Defendants and their operations;

(d)   Soliciting the Knichel Defendants' top revenue customers;

(e)   Interfering with Knichel Defendants' ability to obtain general contracts with rail carriers; and

(f)   Diverting the Knichel Defendants' mail and 1-800 number to Cornerstone's Memphis, Tennessee offices.

Cornerstone argues that a common law unfair competition claim exists in Pennsylvania only where a business engages in competition with another that causes confusion for the customers as which company is soliciting their business. Cornerstone further contends that because there is no evidence in the record that it attempted to confuse customers in its solicitation or that any action taken by Cornerstone created customer confusion, there is no legal basis to support Knichel's unfair competition claim. The common law tort of unfair competition is not as narrow and clear as Cornerstone contends.

The Pennsylvania Supreme Court has noted that common law unfair competition "is a limited concept. Primarily, and strictly, it relates to the palming off of one's goods as those of a rival trader." *Pottstown Daily News Publishing Co. v. Pottstown Broadcasting Co.*, 411 Pa. 383, 391 (1963) (quoting *A.L. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 531 (1935)).  The court further explained: "[i]n recent years [the] scope [of unfair competition] has been extended. It has been held to apply to misappropriation as well as misrepresentation." *Id.* Moreover, Pennsylvania courts have recognized a cause of action for common law unfair competition where there is evidence of: trademark and trade name infringement, *see Goebel Brewing Co. v. Esslingers, Inc.*, 95 A.2d 523 (Pa. 1953); tortious interference with contract, *see*

-19-

*ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003); improper inducement of another's employees, *see Albee Homes, Inc. v. Caddie Homes, Inc.*, 207 A.2d 768, 771 (Pa. 1965); trading on another's reputation, *see Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838 (Pa. 1957); as well as patent rights infringement and unlawful use of confidential information.

The Restatement (Third) of Unfair Competition also recognizes several specific categories of commercial behavior that give rise to a claim of unfair competition, including: (1) deceptive marketing; (2) infringement of trademark and other protectable intellectual property rights; (3) misappropriation of trade secrets and other intangible trade values; and (4) acts or practices that are actionable under federal or state statutes. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 (1995). Also included in the Restatement is a "catch-all" or "residual" category which includes "other acts or practices determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public." *Id.* § 1. The comment accompanying this provision explains: "subsection (a) therefore includes a residual category encompassing other business practices determined to be unfair . . . . An act or practice is likely to be judged unfair only if it substantially interferes with the ability of others to compete on the merits of their products." *Id.* at § 1 cmt. g. The comment further identifies several business practices that would fall under this "catch-all" category, such as interfering with the business of another by acts or threats of violence, instituting or threatening to institute groundless litigation, engaging in defamation, and establishing or maintaining an unlawful restraint of trade. *Id.*, *See also Synthes (USA) v. Globus Med., Inc.*, 2005 U.S. Dist. LEXIS 19962 (E. D. Pa. 2005).

The Pennsylvania Supreme Court has never specifically adopted the Restatement's definition, but lower state courts and federal courts sitting in diversity have recognized causes of action for unfair competition based the Restatement categories, and the Eastern District of Pennsylvania has cited the Restatement's "catch-all" provision as a basis for a cause of action for common law unfair competition. *See ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d at 688-689 (finding that a claim of tortious interference with contract could be the basis for an unfair competition claim under Pennsylvania law); *Yeager's Fuel, Inc. v.*

*Pennsylvania Power & Light Co.*, 953 F. Supp. 617, 667-668 (E.D. Pa. 1997).  No Pennsylvania appellate court, however, has ever based a claim of unfair competition on defamation and/or business disparagement.

As set fully below, the Court has determined that Knichel's claims of defamation and business disparagement fail as a matter of law.  Moreover, there is no evidence in this record that such alleged action by Cornerstone "substantially interfere[d] with [Knichel's] ability . . . to compete . . ."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 cmt. g.  Because none of Knichel's contentions of bad acts by Cornerstone fall with the Restatement's "catch all" category, Knichel's claim of unfair competition fails.

Knichel's Claims of Defamation and Business Disparagement

At Counts IV and V of their amended counterclaim, the Knichel Defendants allege causes of action for defamation and business disparagement. Cornerstone argues that such claims are barred by Pennsylvania's one (1) year statute of limitations.  *See* PA. CONS. STAT. ANN. § 5523.  The Knichel Defendants' initial answer and counterclaim was filed on June 27, 2003, but Cornerstone argues that the defamation and business disparagement claims were not added until the Knichel Defendants filed the amended answer and counterclaim on June 1, 2004, more than one (1) year after the conduct at issue.

Rule 15 of the Federal Rules of Civil Procedure governs the effect of amended and supplemental pleadings, and in pertinent part states:

> (c)   **Relation Back of Amendments.**  An amendment of a pleading relates back to the date of original pleading when
>
> (2)   the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . .

FED. R. CIV. P 15(c)(2).  Therefore, Rule 15(c)'s "relation back" provisions, if satisfied, permit Knichel's proposed amendments to relate back to the date of the filing of the original counterclaim. The Third Circuit has explained that "in essence, application of Rule 15(c) involves a search for a common core of operative facts in the two pleadings. As such, the court looks to whether the opposing party has had fair notice of the general fact situation and legal

-21-

theory upon which the amending party proceeds." *USX Corp. v. Barnhart*, 395 F.3d 161, 167 (citing *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir.2004)).

A review of the counterclaim and amended counterclaim shows that all the facts necessary to support Knichel's claims of defamation and business disparagement were raised in the counterclaim filed in June of 2003.  The amended counterclaim raised no new factual averments, it merely added the two (2) new legal theories of recovery for the alleged improper conduct. Moreover, the conduct upon which Knichel based its claims of defamation and business disparagement, can be used in some instances as evidence of common law unfair competition and tortious interference, though this Court found both of those claims wanting in this instance.  Therefore, the Court finds that Cornerstone had fair notice of the alleged conduct upon which the new claims are based, and the claims of defamation and business disparagement set forth in the amended counterclaim relate back to the counterclaims original filing on June 27, 2003, well within the statute of limitations.

Though Cornerstone does not specifically argue that Knichel's claims of defamation and business disparagement lack merit, such claims must have at least a modicum of support in the record.  As stated above, Knichel cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Indeed, Knichel must "[point] to sufficient cognizable evidence to create material issues of fact concerning every element as to which [Knichel] will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).  The Court finds little support in this record to support the Knichel Defendants' claims of defamation and business disparagement.

To establish a *prima facie* case of defamation, Knichel must prove that: (1) the alleged communication was defamatory; (2) Cornerstone published the communication; (3) the communication applied to Knichel; (4) the recipient understood the defamatory meaning; (5) the recipient understood the communication as intended to be applied to Knichel; (6) Knichel incurred special harm result from publication of the communication; (7) abuse of a conditional

-22-

privilege. 42 PA. CONS. STAT. ANN. § 8343(a).  In the amended counterclaim, Knichel bases

both the defamation and business disparagement claims on statements set forth in "Paragraph

49, and elsewhere . . ." in the counterclaim.  *See* Amended Counterclaim ¶¶ 68, 69, 74 & 75.

The alleged statements set forth in Paragraph 49 of the counterclaim are repeated at Paragraph

36 of Knichel's Responsive Concise Statement of Material Facts with citations to Bill

Knichel's supplemental affidavit[5] and the deposition transcripts of Kristy Knichel and Jerry

Parks.  In her deposition Kristy Knichel makes vague reference to statements, allegedly made

by Cornerstone, that were written down by herself and others after customers informed them of

the statements. Deposition of Kristy Knichel p. 77. Jerry Parks, a customer of Cornerstone,

made reference in his deposition to a conversation with a Cornerstone representative who told

him that "I should be committing my boxes to them, because when it gets slow or after Knichel

goes out of business, [Cornerstone] would be the only game in town." Deposition of Jerry

Parks p. 35.   The only other alleged defamatory or disparaging statement in Parks' deposition

was the following exchange between Parks and Knichel's attorney:

> Q. (By Attorney Hicks) One of the comments you remember
> him making was Mr. Knichel's new operation, Knichel
> Logistics, would no longer be in business at the end of the
> year?
>
> A. Yes

Deposition of Jerry Parks p. 35.  Tellingly, Mr. Parks testified that he continues to do business

with Knichel Logistics.

A statement is defamatory when "it tends to so harm the reputation of another as to

lower him in the estimation of the community or to deter third persons from associating or

dealing with him." *12th Street Gym, Inc. v. Gen'l Star Indem. Co.*, 93 F.3d 1158, 1163 (3d Cir.

1996) (internal citations omitted).  The Court is unable to infer from this record that statements

were in fact made, let alone give them the defamatory meaning required to satisfy the elements

necessary to prove the causes of action.  Further, some of the alleged statements are statements

---

[5]     In his affidavit, Knichel merely repeats the allegations set forth in Paragraph 36
without specifics as to who made the statements, to whom the statements were made, when the
statements were made, or how the statements were perceived by Knichel's customers.

of opinion, as opposed to a statements of fact, and may be considered defamatory "only if [the statement] implies the allegation of undisclosed defamatory facts as the basis for the opinion." RESTATEMENT (SECOND) OF TORTS § 566 (1977). In other words, such a statement-also referred to as a "mixed opinion"-is capable of defamatory meaning if it "is reasonably understood as implying the assertion of the existence of undisclosed facts about the plaintiff that must be defamatory in order to justify the opinion." *Id.* at cmt. c.  Again, the Court is unable to find defamatory meaning in such statements based upon the record.

Therefore, summary judgment will be granted in favor of Cornerstone on the Knichel Defendants' claims of defamation and business disparagement set forth at Counts IV and V respectively in the amended counterclaim.

<u>Knichel's Breach of Contract Claims</u>

At Count II of the counterclaim, Knichel contends that Cornerstone failed to pay him "commissions, rail rebates, bonuses and/or other profits" under the June 24, 1997, employment agreement ("Employment Contract") and the April 26, 2000, agency agreement ("Agency Contract")[6].  *See* Counterclaim ¶¶ 61 and 62.  Knichel contends that under the terms of the written agreements "as modified, amended and or supplemented orally or by practice" he has a claim to commissions on **profits** realized by all loads or shipments billed by him through Cornerstone.  Knichel's Memorandum in Opposition p. 10 (Emphasis added).  Knichel asserts that all of his contracts with Cornerstone were premised on the payment of commissions in varying rates for "profits" earned on each load or shipment billed through Cornerstone and that such profit includes "open payables" that Cornerstone allegedly realized as taxable income beginning in October of 1999.  *See* Knichel's Responsive Concise Statement of Material Facts ¶¶ 19 and 20.   After reviewing the contracts, the Court disagrees.

First, Knichel is limited on its claim under the Employment Contract by Pennsylvania's four (4) year statute of limitations on actions upon written or oral contracts.  *See* 42 PA. CONS. STAT. ANN. § 5525.  The Knichel Defendants' initial answer and counterclaim was filed on

---

[6]     There was a third letter agreement between the parties subsequent to the Agency Contract which merely changed the amount of Knichel's commission and is not material to the Court's analysis.

-24-

June 27, 2003, therefore, any claim under the 1997 Employment Agreement prior to June 27, 1999, is barred by the statute of limitations.

Further, the Court finds that the two letter contracts are separate and distinct, each defining the different relationships between the parties. Pursuant to the Employment Contract, Knichel's compensation included:

1.    $60,000 in annual salary, .21 cents mileage and an expense account;

2.    Commission will be based on the following:

| | |
|---|---|
| 2,000 - 5,000 | 10% commission |
| 5,001 - 7,500 | 20% commission |
| 7,501 - and up | 25% commission |
| 15,001 - up | 5% additional bonus commission paid (based on 12 month average) |

Commissions are based on the average of the monthly net **profit** for each six month commission period.

3.    Commissions will be paid semi-annually in June and December.

4.    You will receive 25% of the Pittsburgh office rebates. Rebates will be paid upon collection from railroads.

5.    Any uncollected invoices over 60 days, at time of commission settlement may be deducted from commissions. Once collected the amounts will be paid on the following commission check. . . .

Plaintiff's Amended Complaint, Exhibit A (Emphasis added). The Employment Contract was for one (1) year but was renewable absent notice of termination by either party. *Id.*

Under Pennsylvania law, the meaning of an unambiguous written instrument presents a question of law for resolution by the court. *Community College of Beaver County v. Community College of Beaver County, Soc. of the Faculty*, 739 A.2d 133 (1977). When interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. *Toombs NJ Inc. v. Aetna Casualty & Surety Co.*, 591 A.2d 304, 307 ( Pa. Super. 1991); *Greene v. Oliver Realty, Inc.*, 363 Pa. Super. 534, 543, 526 A.2d 1192, 1194, *allocatur denied*, 517 Pa. 607, 536 A.2d 1331 (1987). Where the language of an agreement is clear and unambiguous, the focus of the court's interpretation must be upon the terms as "manifestly expressed, rather than as, perhaps, silently intended." *See Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982).

-25-

Moreover, courts are not to assume that a contract's language was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized. *Steuart v. McChesney*, 444 A.2d at 662.

The Employment Contract clearly covers commission on profits, however, the contract specifically sets forth that commissions would be paid on "the average of the monthly net profit for each six month commission period." Knichel contends that his commissions were to based upon profits generated from "loads or shipments," which implies to this Court that profits must be calculated on a "per load" or "per shipment" basis. *See* Knichel's Responsive Concise Statement of Material Facts ¶ 45. This contention is contrary to the plain language of the contract which contemplates an average profit over a six (6) month period. There is no language in the contract, nor is there any evidence in the record that the profits were to be calculated on a per shipment basis.

Knichel further claims that he is entitled to profits on open payables beginning on or about October 7, 1999, and continuing every year thereafter, including up to the present time. Though the Court is unable to determine from the agreement if open payables were part of the net profit calculation, the commissions were to be based upon clearly defined six (6) month commission periods. Further, the commissions paid on net profits ended upon termination of the Employment Contract on May 1, 2000, the effective date of the Agency Contract. The Employment Contract makes no reference to any profits realized after the termination of the contract that would relate back to a commission period prior to such termination. The Court does, however, find an ambiguity regarding whether the open payables were to be a part of the profit calculation. Therefore, Knichel's breach of contract claim on the Employment Contract for failure to pay commission on certain profits may proceed, but based only upon the net profits from on or after June 27, 1999, through April 30, 2000. Based upon Knichel's expert report on damages, the amount of commissions Knichel is allegedly owed for the period from May 1999 through December 1999 is $7,104.00, and the amount allegedly owed for the period from January 2000 through April 30, 2000 is $2,161.00. *See* Knichel's Appendix to Brief in

Opposition, Exhibit G.

Knichel also contends that he was not paid certain railroad rebates required under paragraph 4 of the Employment Contract.  Knichel, however, fails to direct this Court to any specific evidence of rebates received by Cornerstone that entitle Knichel to a commission.  Finding no evidence of breach of paragraph 4 of the Employment Contract in the record, Knichel is limited at trial to commissions on net profits as above noted.

Under the clear and unambiguous language of the Agency Contract, Knichel was not entitled to commissions on profits.  Pursuant to the Agency Contract, Knichel's compensation included only - "60% commissions on all shipments billed through Cornerstone. Commissions will be paid every Friday for the previous weeks' business." *See* Amended Complaint Exhibit B, ¶ 3.  The language clearly contemplates commissions on shipments billed, there is absolutely no language regarding the calculation of profits.  Moreover, the contract addresses the parties' change in status to agent and principal, and does not incorporate any part of the Employment Contract.  Any claim for commission on profits by Knichel on or after May 1, 2000, has no basis under the Agency Contract, and will be dismissed.

Knichel also makes a claim under paragraph 6 of the Agency Contract, which reads: "[a]gent will be charged 100% of the amount of any bad debt over the Cornerstone credit limit." *See* Amended Complaint Exhibit B, ¶ 6.  Knichel contends that he is owed $9,685.00 in commissions earned on shipments made by Seoul Shik Poom and Gold River Mills billed through Cornerstone prior April 27, 2003.  *See* Knichel's Responsive Concise Statement of Material Facts ¶ 38; *See* Knichel's Appendix to Brief in Opposition, Exhibit G.   Knichel asserts that Cornerstone charged a deduction against his final commission payment even though the receivable amounts were less than Cornerstone's credit limits for these customers. *Id.*  Cornerstone allegedly collected the receivables from both of the customers, but refused to pay the commissions due on such receivables to Knichel.  The Court finds this is the only evidence in the record of a breach of the Agency Contract, and will limit Knichel's claim accordingly.

-27-

<u>Knichel's Claim for Attorney Fees</u>

This Court finds no basis in law or fact for Knichel's claim for attorney fees in this action.  Summary judgment on Knichel's claim for attorney fees will be granted.

<u>This Court's Subject Matter Jurisdiction</u>

The only claim remaining in this action is Knichel's state law breach of contract claim. Under 28 U.S.C. §1367(c)(3), "[t]he district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if - the district court has dismissed all claims over which it has original jurisdiction."  *See* 28 U.S.C. §1367(c)(3).   Therefore, after dismissal of all federal claims, a district court may decline to exercise supplemental jurisdiction over the remaining state law claims. *See Stehney v. Perry*, 101 F.3d 925, 939 (3d Cir. 1996).  "This decision is committed to the sound discretion of the district court." *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 444 (3d Cir. 1997), *cert. denied*, 523 U.S. 1059 (1998). This Court's jurisdiction, therefore, must be examined under 28 U.S.C. § 1332, which requires complete diversity of the parties and an amount in controversy of $75,000.00.  The damages remaining in this instance fall woefully short of the required jurisdictional amount.

Whenever subject matter jurisdiction is found to be lacking, the mandatory nature of the language of Rule 12(h)(3) of the Federal Rules of Civil Procedure is controlling: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *See* FED. R. CIV. P. 12(h)(3).  Because there is no federal statutory authority that permits a United States District Court to transfer an action filed here directly to a state court, this Court has no power to transfer, but only to dismiss. *See McLaughlin v. Arco Polymers, Inc.,* 721 F.2d 426, 428 (3d Cir. 1983); *Grand Blanc Education Association v. Grand Blanc Board of Education*, 624 F.2d 47, 49 n.4 (6th Cir. 1980);  *Dantes v. Western Foundation Corporation Association*, 614 F.2d 299, 301 (1st Cir. 1980); *White v. Commercial Standard Fire and Marine Co.*, 450 F.2d 785, 786 (5th Cir. 1971); *Atlantic Ship Rigging Co. v. McLellan*, 288 F.2d 589, 591 (3d Cir. 1961). The contract claims will, therefore, be dismissed.

-28-

V.    CONCLUSION

Based on the foregoing, the motion for summary judgment filed by the Knichel Defendants shall be granted in full.  Cornerstone's motion for summary judgment will be granted in part and denied in part. Summary judgment shall be entered in favor of Cornerstone for all of the Knichel Defendants' claims except for the breach of contract claims as expressly limited by the Court.  Because this Court lacks subject matter jurisdiction over the breach of contract claims, such claims will be dismissed  pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure.

An appropriate Order will follow.

s/ David Stewart Cercone
David Stewart Cercone,
United States District Judge

cc:    Paul David Burke, Esquire
       Matt A. Jarrell, Esquire
       Sherrard, German & Kelly, P.C.
       Two PNC Plaza, 28th Floor
       620 Liberty Avenue
       Pittsburgh, PA 15222

       Ronald L. Hicks, Jr., Esquire
       Joshua R. Lorenz, Esquire
       Meyer, Unkovic & Scott LLP
       1300 Oliver Building
       Pittsburgh, PA 15222